SUPERIOR COURT 
 
 THE NOLAN GROUP, LLC v. STATE ELECTRIC CORPORATION

 
 Docket:
 2284CV00789-C
 
 
 Dates:
 March 5, 2024
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT’S MOTION FOR SUMMARY JUDGMENT
 
 

             This case arises out of a failed business relationship between Plaintiff The Nolan Group, LLC (“Plaintiff” or “TNG”) and Defendant State Electric Corporation (“Defendant” or “State Electric”). TNG has brought a four-count Complaint against State Electric, asserting claims for breach of contract, fraudulent misrepresentation, negligent misrepresentation, and unfair and deceptive trade practices under G.L. c. 93A, § 11. Following a nearly two-year period of active discovery, State Electric has moved for summary judgment on all counts of the Complaint. For the reasons which follow, Defendant’s motion shall be ALLOWED IN PART and DENIED IN PART.
RELEVANT FACTS[1]
            TNG is a consulting firm, State Electric an electrical contractor with which it did business between 2018 and 2021. The four-year window of the parties’ relationship can be
 
--------------------------------------------
 
[1] The following facts are drawn from the summary judgment record, as summarized in the parties’ jointly filed Superior Court Rule 9A(b)(5) Statement. The evidence is construed in the light most favorable to TNG, the non- movant, with all conflicts resolved in its favor for purposes of the Rule 56 motion only. See Bulwer v. Mt. Auburn Hosp., 473 Mass. 672, 680 (2016).
 
                                                                        -1-
 
divided into two distinct periods: (1) June, 2018 – March, 2020 (the “First Contract”) and (2) March, 2021 – September, 2021 (the “Second Contract”). Both periods are implicated in the present lawsuit.
            In the First Contract, representatives of TNG and State Electric negotiated a 12-month agreement (renewable annually), whereby TNG would perform unspecified services in which it leveraged its business relationships to help State Electric pitch prospective clients and thereby win compensated project work. Thus, in or around June of 2018, TNG and State Electric entered into a contract[2] in which State Electric agreed to pay a monthly retainer of $10,000 and production fees equal to 3% of all contract amounts State Electric earned from project work TNG helped procure.[3]
            From June of 2018 until March of 2020, TNG worked to assist State Electric in securing electrical contract projects from prospective clients such as Eversource, Encore, Gilbane and Stantec. In return, State Electric made all due monthly retainer payments of $10,000, but paid no percentage fees of any kind in respect of the new contractual project work it obtained.
            On or around March 23, 2020, State Electric notified TNG that a business slowdown caused by the Covid-19 pandemic required it to suspend its consulting arrangement with TNG. State Electric expressed the hope that this suspension would be short-lived and that the parties would be back working together soon. The record stands unrefuted that State Electric fully paid its $10,000 monthly retainer to TNG from June, 2018 through March, 2020, that TNG never
 
--------------------------------------------
 
[2] TNG’s chief executive, Gregg Nolan, maintains that the parties memorialized their agreement in a signed writing that he personally witnessed. But despite diligent efforts throughout an extended period of discovery, no such mutually executed writing has been located by either side.
 
[3] The Court recognizes that the compensation terms of the parties’ contract are matters of substantial dispute and conflict in the evidence. The percentage fee hereinabove described is emphatically denied by the Defendant, but represents the most generous construction of the record evidence in favor of the Plaintiff’s claim, as Rule 56 requires.
 
                                                                        -2-
 
demanded additional fees in connection with its work during this time period, and that State Electric was entirely within its rights to suspend the parties’ contract at the time and in the manner it did.
            The Second Contract began with a meeting among the principals of TNG and State Electric on March 23, 2021, exactly one year to the day following the parties’ suspension of their First Contract. At this meeting, TNG chief executive Gregg Nolan expressed a desire for State Electric to re-engage his firm’s business services and resume the contractual relationship the pandemic had interrupted. According to Mr. Nolan, the meeting ended with an oral understanding and “handshake agreement” between himself and State Electric president Ronald Koning. The essence of the bargain was that TNG would resume its efforts to help State Electric secure new business projects, with a scope of work commensurate with TNG’s previous engagement. According to Mr. Nolan, the parties agreed that their contract would have neither a fixed durational term nor a monthly retainer. Instead, State Electric agreed to pay TNG a flat fee that would range between 8% and 12% of any newly contracted business, with the precise level of the percentage payment to be set from project to project.[4]
            The TNG/State Electric handshake agreement was never reduced to writing. Indeed, the record does not even reflect an attempt by these parties to do so. Following their March 23, 2021 meeting, however, TNG proceeded to assist State Electric in pitching its business to a series of four or five prospective clients. One such assisted pitch to The Richmond Group is alleged to
 
--------------------------------------------
 
[4] Once again, the Court acknowledges that the putative “handshake agreement” alleged by TNG is a matter of substantial dispute. State Electric insists that the very imprecision in the compensation term now put forward by Plaintiff reflects a failure by the parties to reach a definite accord in 2021. In Mr. Koning’s telling, the handshake represented nothing more than the gestural civility with which businessmen customarily conclude meetings. That said, the Court is constrained by Rule 56 to credit the contrary (first-hand) account of Mr. Nolan, who testified to the effect that these parties did reach agreement on the essential terms of a renewed bargain. One expressed in terms of a 4% “range” regarding the per project fee, but a definite and fully concluded deal nonetheless.
 
                                                                        -3-
 
have resulted in an engagement known as “321 Harrison Avenue,” an electrical project that generated approximately $3.2 million in revenues to State Electric.[5]
            TNG thereafter pursued State Electric for fee compensation in connection with 321 Harrison Avenue for months, without success. In September, 2021, TNG transmitted a formal invoice to State Electric in the amount of $50,000, a fee it deemed “appropriate” based on consultation with others in the industry. State Electric never paid this invoice, or any other amount of money in respect of the parties’ Second Contract.
            At no time prior to the onset of this litigation did TNG ever make a demand on State Electric for purportedly due but unpaid amounts under the parties’ First Contract. The Chapter 93A demand letter that TNG served on State Electric in November, 2021 asserts no breach of contract for services rendered prior to March, 2021. The Complaint in this action likewise makes no claim for breach of the First Contract, and indeed asserts no substantive factual allegations of any kind concerning events prior to March of 2021. Finally, and consistent with the scope of Plaintiff’s contract claim as pleaded (and never amended), TNG’s articulation of both its cause of action and its damages in sworn responses to interrogatories reference the 321 Harrison Avenue project exclusively. No mention whatsoever is made of any other alleged contract violations by State Electric.
            Further to its flagship claim for breach of contract, Plaintiff’s Complaint additionally asserts claims for fraudulent and negligent misrepresentation, and unfair and deceptive business practices under G.L. c. 93A, § 11. All three of these claims rest, by TNG’s own admission, on
 
--------------------------------------------
 
[5] State Electric contrarily maintains that it enjoyed a pre-existing business relationship with The Richmond Group, and that 321 Harrison Avenue was a project already in its pipeline prior to the claimed involvement of TNG. Once again, however, and for purposes of summary judgment only, the Court must credit the account of Gregg Nolan that re-introductions facilitated by TNG were a substantial procuring cause of State Electric’s engagement by The Richmond Group for this project.
 
                                                                        -3-
 
two unadorned facts. Namely, that (1) State Electric agreed to pay percentage fees to TNG based on new project business that TNG helped it to generate; and (2) State Electric failed to pay TNG any of these agreed fees. No other misstatements, false assurances, misleading inducements, misrepresentations or bad business behaviors of any kind are alleged in support of these claims.
DISCUSSION
I. LEGAL STANDARD
            “Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.” Helfman v. Northeastern Univ.,
485 Mass. 308, 314 (2020), quoting Godfrey v. Globe Newspaper Co., 457 Mass. 113, 118-19 (2010). “The moving party bears the burden of demonstrating the absence of a triable issue of fact on every relevant issue.” Scholz v. Delp, 473 Mass. 242, 249 (2015). The moving party may satisfy this burden by submitting affirmative evidence negating an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of her case at trial. Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, “the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact.” Barron Chiropractic & Rehab., P.C. v. Norfolk & Dedham Grp., 469 Mass. 800, 804 (2014). “Bare assertions made in the nonmoving party’s opposition will not defeat a motion for summary judgment.” Id. Accord Mass. R. Civ. P. 56(e) (“[A]n adverse party may not rest upon the mere allegations or denials of his pleading.”).
            “In deciding whether summary judgment is appropriate, a judge considers evidence presented in the pleadings, depositions, answers to interrogatories, admissions on file, and any
 
                                                                        -5-
 
affidavits.” O’Connor v. Redstone, 452 Mass. 537, 550 (2008) (citing Mass. R. Civ. P. 56(c)). The Court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. See Psychemedics Corp. v. Boston, 486 Mass. 724, 731 (2021); O’Connor, 452 Mass. at 550.
II.  PLAINTIFF’S CLAIMS
            Plaintiff’s Complaint asserts four causes of action: (1) Breach of Contract (Count III); (2) Fraudulent Misrepresentation (Count II); (3) Negligent Misrepresentation (Count I); and (4) Unfair and Deceptive Trade Practices, in violation of G.L. c. 93A, § 11 (Count IV). These claims are addressed in this sequence.
            A. Breach of Contract
            Regarding the Plaintiff’s claim for breach of contract in Count III, the Court is compelled to separate its analysis into two parts in order to treat the allegations related to the First Contract and Second Contract independently.
            1. The First Contract
            As concerns the First Contract, the Court agrees with Defendant that summary judgment should enter against this aspect of the claim. Fairness requires that a litigant be held to the claims and defenses contained in its pleadings. Where “[n]o factual allegation of the complaint relates to the plaintiff’s current theory of the case, and nothing in the pleading would give notice that such a theory was being advanced […] plaintiff [i]s not entitled to defeat summary judgment on a claim not pleaded.” Hirschhorn v. Commonwealth, No. 08-P-1896, 2009 WL 4110853, at *1 (Mass. App. Ct. Nov. 25, 2009) (Rule 1:28 decision) (internal citation omitted). Accord Hardwick v. Tremblay Moving & Storage Co., No. 05-P-1284, 2006 WL 2884011, at *1 (Mass. App. Ct. Oct. 11, 2006) (“[T]he plaintiff is bound by her pleadings … and … [an argument] she
 
                                                                        -6-
 
did not raise … until the hearing on the motion for summary judgment … is waived.”); Parkin v.
Building Inspector of Tyngsborough, No. 04-P-1307, 2005 WL 3440721, at *2-3 (Mass. App. Ct. 2005) (trial court properly disregarded allegation asserted in opposition to summary judgment that was not raised in complaint); Diiorio v. Caliber Home Loans, Inc., No. NOCV2015-00852, 2016 WL 10519410, at *6 (Mass. Super. Ct. Apr. 04, 2016) (plaintiff “is precluded from opposing summary judgment on [a] ground” she “failed to allege … anywhere in her complaint”); Fleming v. Lind-Waldock & Co., 922 F.2d 20, 24 (1st Cir. 1990) (“Summary judgment is not a procedural second chance to flesh out inadequate pleadings.”). This is such a case.
            Plaintiff’s Complaint asserts that its contract claim derives from “[t]he defendant, State Electric’s, failure to pay the plaintiff, The Nolan Group, the amounts due under their March 23, 2021 contract.” (Compl. ¶ 24.) The Complaint further recites that Plaintiff’s claimed damages are “a direct result of the defendant, State Electric’s, breach of the March 23, 2021 contract with The Nolan Group.” (Compl. ¶ 25.) The Complaint contains not a single substantive allegation of fact that predates March 23, 2021. Given that the First Contract TNG’s Memorandum of Opposition now alleges to have been breached concluded more than a year prior to any breach of the Second Contract asserted in the Complaint, and that such contract is purported to have contained materially different terms, the Court must treat this un-pleaded claim as waived. See supra, Hirschhorn; Hardwick; Diiorio.
            Reinforcing the Plaintiff’s waiver of any claim for breach of contract outside the scope of the one alleged in the Complaint is the fact that TNG has been unable to produce the written agreement purportedly containing the percentage-fee promise State Electric is now alleged to have dishonored. More tellingly, TNG never invoiced State Electric for this supposed payment
 
                                                                        -7-
 
deficiency at any time during the First Contract’s two-year pendency; never made any written or even oral assertions to State Electric that further fees were owed to it; and never included any reference to moneys allegedly due under the First Contract in its Chapter 93A demand letter to State Electric. Indeed, at all times throughout this litigation, including in its once-amended answers to State Electric’s interrogatories, Plaintiff has maintained that its only damages claims sourced to Defendant’s alleged failure to compensate it for the 321 Harrison Avenue project in accordance with the Second Contract.
            The first time that Plaintiff ever suggested that earned percentage fees were unpaid and owing under the parties’ First Contract occurred during the deposition testimony of Gregg Nolan. That testimony, however, flatly contradicted both the terms of the Chapter 93A demand letter, the claims pleaded in the Complaint, and the Plaintiff’s sworn answers to interrogatories, none of which TNG ever sought to amend.[6] In these circumstances, State Electric would be entirely warranted in presuming that, notwithstanding Mr. Nolan’s testimony, Plaintiff was not pursuing such an implausible and unsupported claim. That Defendant has chosen, in addition to arguing waiver, to address this claim on its merits when seeking summary judgment will not be held against it. The claim has been waived. See supra, Hirschhorn, Hardwick, Diiorio. See also Creeden v. Saineoff, 621 F. Supp. 2d 18, 21 (D. Mass. 2009) (“A plaintiff cannot ... pursue a different theory [than that pleaded] as the case progresses, at least not without amending his complaint.”).
 
--------------------------------------------
.
[6] Indeed, it bears mention that Plaintiff itself concedes that percentage fees of the type claimed by Mr. Nolan during his deposition are not standard for the industry, and that TNG never secured such fees in any of its other consulting contracts.
 
                                                                        -8-
 
            The Court is, of course, aware that Mass. R. Civ. P. 15 invests it with discretion to allow amendments to pleadings liberally when the interests of justice so dictate. This is not such a case. In addition to the more than three years that followed the initial accrual of this claim, Plaintiff has allowed more than 18 months to pass since Mr. Nolan first surfaced the factual basis for it during deposition; and it has still not moved for leave to amend its Complaint to assert such a claim. Court-ordered deadlines for amendments to pleadings and the conclusion of discovery expired long ago; and it is simply too late in the day to permit Plaintiff to litigate a new, substantively different, and un-pleaded claim in an attempt to thwart the entry of summary judgment against the claim it did plead.[7] To rule otherwise would at once offend fairness and mock the rules of civil litigation. See Doull v. Foster, 487 Mass. 1, 23 (Mass. 2021) (trial court did not abuse discretion in denying leave to amend where discovery had closed and plaintiffs failed to explain delay); Mathis v. Massachusetts Electric Co., 409 Mass. 256, 264-65 (1991) (“[A]n unexcused delay in seeking to amend is a valid basis for denial[.]”); Flynn v. Police Dept. of Becket, No. 11-P-2058, 2012 WL 4739670, at *1 (Mass. App. Ct. Oct. 5, 2012) (upholding denial of “motion, filed less than three weeks before the close of discovery, [that] was sparse with respect to the reason for delay and … failed to demonstrate diligence”); DiVenuti v. Reardon, 37 Mass. App. Ct. 73, 77 (1994) (“Among the good reasons [ ] for which a motion to amend may be denied are that no justification for the lateness of the motion is apparent (beyond counsel for the moving party having had a late dawning idea) and that … the nonmoving parties would be caught off balance by the proffered amendment.”).
 
--------------------------------------------
 
[7] Leave to amend is ordinarily granted “unless some good reason appears for denying it.” Ramirez v. Graham, 64 Mass. App. Ct. 573, 579-80 (2005). “Undue delay, bad faith or dilatory motive on the part of the movant” – all present and unexplained in this case – are among the good reasons frequently cited for denial of requested amendments to pleadings. Castellucci v. United States Fid. & Guar. Co., 372 Mass. 288, 290 (1977).
 
                                                                        -9-
 
            2. The Second Contract
            Plaintiff’s breach of contract claim under the parties’ Second Contract stands on much better footing. The claim is both properly pleaded, and supported by all of the evidentiary requisites for a valid and binding contract. See Bulwer, 473 Mass. at 690 (reciting elements of claim for common law breach of contract). Crediting the testimony of Gregg Nolan, as it must when evaluating Defendant’s Rule 56 motion, id. at 680, Plaintiff has put forward sufficient
evidence that TNG and State Electric exchanged reasonably definite promises, that TNG fulfilled its part of the bargain by helping to facilitate State Electric’s contract with The Richmond Group for the 321 Harrison Avenue project, and that State Electric failed to make the agreed percentage payment and thereby caused economic harm to TNG. No more is required for an actionable breach of contract claim. Id. at 690.
            In its Motion for Summary Judgment, Defendant contests the enforceability of Plaintiff’s claimed contract on just one ground.[8] State Electric maintains that Plaintiff’s asserted contract is “too indefinite” as to material terms to be enforceable at law. The Court does not agree. Construed in the light most favorable to TNG, the record reflects that authorized representatives of the parties came to a verbal agreement that they marked with a handshake; that the agreement was reasonably specific as to the services TNG was to provide in support of State Electric’s business-seeking (indeed, there were several years of historical antecedents in this regard); and that the agreement provided that State Electric would compensate TNG for its services based on a percentage (ranging from 8-12%) of the new business revenues it helped to secure. There is no evidence in the record suggesting that the parties were still negotiating over the terms of their
 
--------------------------------------------
 
[8] State Electric presses neither its Best Evidence nor Statute of Frauds challenges – asserted against the Plaintiff’s claim under the First Contract – to this aspect of TNG’s contract claim in Count III. Nor would any such challenges have legal merit, matters warranting no elaboration here.
 
                                                                        -10-
 
bargain, or had deferred completion of their contract pending further discussions or the resolution of open issues. To the contrary, the evidence permits the strong inference that the parties considered their discussions to have produced a definite deal, and both sides proceeded to transact business accordingly. To wit, TNG assisted, on State Electric’s express say-so, with an introduction and advocacy that helped to secure The Richmond Group’s 321 Harrison Avenue project; and TNG then sent its client an invoice for the service rendered. All just as Plaintiff’s claimed Second Contract with State Electric contemplated.
            It is true that the parties elected to go forward in their Second Contract without expressing the promised payment percentage with the precision that they might have. Eight to twelve percent of new revenues obviously represents a range rather than a singular rate of payment. But the range so specified does not, at least in this instance, necessarily reflect a failure to reach agreement or an ongoing negotiation over an open and material term.[9] Crediting the account of Gregg Nolan, the parties simply left the particular percentage fee – bracketed by a range – to be set in the future on a project-by-project basis. One can imagine any number of reasons why reasonable business counter-parties might do so. A one-size-fits-all fee percentage might not adequately compensate the consultant for especially extensive efforts; or it might overcompensate the consultant for a particularly large project where its actual efforts and/or contributions toward securing the engagement had been modest.
            Agreeing to a fee within an industry-normative range does not cause the contract to fail for indefiniteness. See Cygan v. Megathlin, 326 Mass. 732, 734 (1951) (“A contract is not to be
--------------------------------------------
 
[9] The Court says “necessarily” because State Electric will naturally be free to present contrary evidence and argument at trial. The undersigned is not declaring as law of the case what TNG’s claimed agreement in fact was. Indeed, there is even ambiguity as to whether the 8-12% fee agreement envisioned payment based on a percentage of new project revenues or new project profits, an ambiguity made the murkier by a $50,000 invoice from TNG that would seem to reflect neither. Once again, the Court has resolved all questions in the evidence in the manner most favorable to Plaintiff’s claim, leaving it to the jury to sort out on a full evidentiary record what (if anything) the parties contractually intended here.
 
                                                                        -11-
 
struck down because one of its material provisions is stated in broad and general terms if, when applied to the transaction and construed in the light of the attending circumstances, the meaning to be attributed to it can be interpreted with reasonable certainty so that the rights and obligations of the parties can be fixed and determined.”); JPMorgan Chase & Co. v. Casarano, 81 Mass. App. Ct. 353, 356 (2012) (“It is not required that all terms of the agreement be precisely specified so long as the material terms are ascertainable.” (quotation omitted)); Backman v. Smirnov, 751 F. Supp. 2d 304, 313 (D. Mass. 2010) (“Where, as here, the plaintiff … is seeking to recover reasonable compensation for services which he rendered at the request of the defendants and for their benefit, the agreement may be enforceable even though the terms relative to compensation are stated in broad and general terms.” (quotation omitted)).[10] Indeed, courts in the Commonwealth have long routinely supplied commercial contracts lacking price provisions with terms representing fair and reasonable compensation – informed by considerations of fair market value, industry standards, the parties’ course of dealing, and other relevant extrinsic evidence – rather than allow otherwise valid and fully performed agreements to fail for indefiniteness. See, e.g., Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 518-19 (1998) (contract that provided to-be-determined price by reference to fair market value held enforceable); Cygan, 326 Mass. at 734-735 (oral promise to pay “additional compensation” for plaintiff’s services if “fair and reasonable” held enforceable at fair market value); Weiner v. Pictorial Paper Package Corp., 303 Mass. 123, 132 (1939) (“Even if [employment] contract … le[ft] the amount of compensation undetermined … reasonable compensation could be
 
--------------------------------------------
 
[10] See also Padilla v. RRA, Inc., 946 P.2d 1122, 1124 (N.M. 1997) (oral contract that defendant would pay plaintiff 1% to 10% commission for securing contracts was enforceable, and jury could find defendant breached contract by failing to pay at least 1% rate); Browne v. Maxfield, 663 F. Supp. 1193, 1198 (E.D. Pa. 1987) (denying summary judgment to defendant where purported contract promised to pay plaintiff a salary between $75,000 and $125,000; “The fact that the exact salary amount ... [was] not pinned down” did not prevent jury from “determin[ing] that contract would have been breached by payment below $75,000. …”).
 
                                                                        -12-
implied.”); Evers v. Gilfoil, 247 Mass. 219, 223-24 (1924) (“The agreement is not void for indefiniteness or uncertainty because the value of [ ] services … was left for future determination.” “[T]he law implies a promise to pay for their reasonable value.”); Brennan v. Employers Liab. Assur. Corp., Ltd., 213 Mass. 365, 367 (1913) (agreement to “make it right” entitled injured employee to “fair compensation”); Noble v. Joseph Burnett Co., 208 Mass. 75, 82 (1911) (enforcing contract requiring defendant to pay plaintiff a “fair and equitable share” of net profits for services rendered); Duff v. McKay, 89 Mass. App. Ct. 538, 544 (2016) (“[S]eeming indeterminacy can be resolved by reference to professional norms in the practice area[.]”); Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Auth., 7 Mass. App. Ct. 336, 387 (1979) (where a contract fails to state amount that plaintiff would receive, court will determine an amount that is reasonable in the circumstances); Ross v. Raytheon Co., No. C.A. 99-5530, 2001 WL 1455863, at *4 (Mass. Super. Ct. Nov. 1, 2001) (Brassard, J.) (“Courts are willing to impute terms into a contract if the parties have specified formulae and procedures that can narrow any uncertainties to the point that an agreement is binding.”).[11] As a final point, the undersigned would note that, even if lack of definiteness as to the fee
 
--------------------------------------------
 
[11] These authorities appear to reflect well settled common law practice in the realm of commercial contracting. Open or variable economic terms will not, without more, cause a contract to fail for indefiniteness. See, e.g., Mar Oil, S.A. v. Morrissey, 982 F.2d 830, 840 (2d Cir. 1993) (“[W]hen the contracting parties manifested an intent to be bound at the time of agreement, the court may supply a compensation term if one can be determined by referring to industry practice.”); Global Exec. Mgmt. Sols., Inc. v. IBM Corp., 260 F. Supp. 3d 1345, 1372 (D. Or. 2017) (“The variable percentage rate does not render the agreement unenforceable.”); Fitzgerald v. Hutchins, 983 A.2d 382, 388 (Me. 2009) (“[I]f a contract leaves open a key term [commission rate], the law invokes the standard of reasonableness, and courts will supply the needed term.”); Padilla, 946 P.2d at 1126 (“[W]hen two parties have bargained for one of them to provide personal services … but … have left the payment term to later negotiations, a court … may determine that the parties have reached an enforceable contract to provide the services for a ‘reasonable’ payment.”); Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp., 74 N.Y.2d 475, 483 (N.Y. 1989), cert. denied, 498 U.S. 816 (1990) (“[A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure[.] … [A] price term may be sufficiently definite if the amount can be determined objectively … by reference to an extrinsic event, commercial practice or trade usage.”). See generally 1 Williston on Contracts § 4:30 (4th ed.) (2023) (“Occasionally, those who … agree to employ others … will make no statement as to the wages or price to be paid. In such a case, the law invokes a standard of reasonableness so that the fair value of the services … is recoverable.”); Restatement (Second) of Contracts § 33, comment (e) (1981) (where parties intend to be bound but “the price is not settled, the price is a reasonable price .…”).
 
                                                                        -13-
 
percentage somehow meant the contract could not be enforced at law, equitable principles of unjust enrichment and quantum meruit would still afford Plaintiff a recovery off the contract and thereby preclude the entry of summary judgment against TNG’s claim. “Unjust enrichment is defined as the ‘retention of money or property of another against the fundamental principles of justice or equity and good conscience.’” Shea v. Cameron, 92 Mass. App. Ct. 731, 740 (2018), quoting Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005). “Quantum meruit” is a theory of equitable remedy based on unjust enrichment. “To achieve recovery upon the theory of quantum meruit, the [plaintiff] must prove (1) that it conferred a measurable benefit upon the defendant[]; (2) that the [plaintiff] reasonably expected compensation from the defendant[]; and (3) that the defendant[] accepted the benefit with the knowledge, actual or chargeable, of the [plaintiff’s] reasonable expectation.” Finard & Co. v. Sitt Asset Mgt., 79 Mass. App. Ct. 226, 229 (2011). In the present case, and again crediting Plaintiff’s version of the facts, TNG conferred a measurable benefit upon State Electric (viz., assistance in winning the 321 Harrison Avenue project); TNG reasonably expected compensation from State Electric for its efforts; and State Electric accepted the assistance and benefit so conferred upon it with full knowledge that TNG expected to be compensated as it had under the parties’ First Contract.[12] No more is required in equity.
            For the foregoing reasons, Defendant’s Motion for Summary Judgment as to Count III of the Complaint shall be ALLOWED IN PART (as to that portion of the claim asserting breaches of the First Contract) and DENIED IN PART (as to that portion of the claim asserting a singular breach of the Second Contract).
 
--------------------------------------------
 
[12] Although not pleaded as a free-standing claim, the Complaint does contain the allegation that, enforceability of the parties’ contract aside, TNG is in all events “entitled to recover the reasonable value of its services to State Electric under the legal doctrine of ‘quantum meruit.’” (Compl. ¶ 16.) The contrary contention Defendant makes in its Reply Memorandum (at p. 5) is flatly false.
 
                                                                        -14-
 
            B. Fraudulent and Negligent Misrepresentation
            In Counts I and II of the Complaint, Plaintiff asserts claims for fraudulent and negligent misrepresentation. Defendant’s Motion for Summary Judgment argues that, no matter how generously construed, the evidence is insufficient to make out the required elements of either claim. The Court agrees.
            It is hornbook law that each of these species of misrepresentation claim requires a false statement of material fact, made with either the intent to deceive or at least negligence, which induces damage-causing reliance on the part of the person or entity to whom the statement was made. See Masingill v. EMC Corp., 449 Mass. 532, 540-41 (2007) (reciting elements of fraudulent misrepresentation); Cumis Ins. Soc’y, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 471-72 (2009) (reciting elements of negligent misrepresentation).
            In the case at bar, the evidence fails to sustain the elemental proposition that State Electric made any misstatement of fact inducing detrimental reliance on the part of TNG. As set forth ante, Plaintiff nowhere alleges that anyone from State Electric made untrue assertions of fact, conveyed misleading representations, or provided false inducements of any kind to prompt TNG to change its position in any way. Nor has Plaintiff adduced any evidence (beyond the summary assertion in its pleading) to suggest that State Electric acted with either fraudulent intent or a lack of care or competence in its communications with TNG. Instead, Plaintiff’s entire proof in support of these claims reduces to the unadorned assertion that State Electric contractually committed to pay TNG for its services in connection with the 321 Harrison Avenue project, and the companion assertion that State Electric failed to fulfill this promise. See supra.
            Generally, unkept promises are not sufficient to support claims of fraud or misrepresentation, Cumis, 455 Mass. at 474; Yerid v. Mason, 341 Mass. 527, 530 (1960). But
 
                                                                        -15-
 
“statements of present intention as to future conduct may be the basis for a fraud action if … the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage.” Starr v. Fordham, 420 Mass. 178, 187 (1995). Put another way, a statement is only actionable under either of these tort theories if “the promisor had no intention to perform the promise at the time it was made.” Cumis, 455 Mass. at 474, citing Brewster Wallcovering Co. v. Blue Mtn. Wallcoverings, Inc., 68 Mass. App. Ct. 582, 601 n.45 (2007). Accord Zhang v. Massachusetts Inst. of Tech., 46 Mass. App. Ct. 597, 605 (1999). “A simple change of mind by a defendant [after the statement was made] does not render an earlier statement false.” Rodowicz v. Massachusetts Mut. Life Ins. Co., 279 F.3d 36, 45 (1st Cir. 2002).
            Plaintiff’s evidence in the present case falters on this principle; for TNG does no more than allege the basic breach of a commercial services agreement, unaccompanied by any other proof of factual misstatement or improper intent on the part of State Electric at the time. It is well settled that simple breaches of contract, standing alone, will not suffice to make out claims for common law misrepresentation. See Cumis, 455 Mass. at 474 (“[F]ailure to perform a contractual duty does not give rise to a tort claim for negligent misrepresentation. … Plaintiffs … may not repackage the same claims under tort law … [and] … [t]here was no evidence or contention … that the defendants never intended to perform their contractual obligations”); Anderson v. Fox Hill Village Homeowners Corp., 424 Mass. 365, 368 (1997) (“[F]ailure to perform a contractual obligation is not a tort in the absence of a duty to act apart from the promise made.”). To allow TNG’s claims to proceed on such a basis, as Plaintiff now urges, is to countenance the tortification by label of black-letter contract law. The Court declines this invitation; and Defendant’s Motion for Summary Judgment shall thus be ALLOWED as to Counts I and II of the Complaint.
 
                                                                        -16-
 
            C. Chapter 93A
            For substantially the same reasons that cause Plaintiff’s claims for common law misrepresentation to fail, the evidence makes out no viable cause of action for unfair and deceptive trade practices under G.L. c. 93A, § 11. As set forth ante, the most the evidence in this case shows is that State Electric committed a breach of contract in failing to honor an alleged promise to pay TNG any fees based on a percentage of the 321 Harrison Avenue project’s revenues. Unfair and deceptive trade practices within the meaning of Chapter 93A require much more.
            It is well settled that not every breach of contract in the commercial marketplace rises to the level of a Chapter 93A violation; and, indeed, the general rule is that ordinary breaches of contract (unaccompanied by other unfair or deceptive conduct) do not. See H1 Lincoln, Inc. v. S. Washington St., LLC, 489 Mass. 1, 17 n.12 (2022) (“[A] breach of contract alone does not amount to an unfair act or practice under G.L. c. 93A. … Even an intentional or knowing breach of contract, standing alone, is insufficient for a c. 93A, § 11 violation. … [An] additional factor beyond even a cheerful breach of contract is required[.]” (internal quotations and citations omitted)); Beverly v. Bass River Golf Mgmt., Inc., 92 Mass. App. Ct. 595, 606 (2018) (“Courts must consider whether the nature, purpose, and effect of the challenged conduct is coercive or extortionate.” (quotation omitted)); Aggregate Industries-Northeast Region, Inc. v. Hugo Key and Sons, Inc., 90 Mass. App. Ct. 146, 152 (2016) (“Ordinary contract disputes ... typically fall outside of the reach of the statute”); Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 (2008) (“The breaching party’s conduct must exceed the level of mere self-interest, rising instead to the level of commercial extortion or a similar degree of culpable conduct”). Here, although the Complaint summarily asserts that the Defendant engaged in “unfair and deceptive acts or practices” (Compl.
 
                                                                        -17-
 
¶ 26), the Rule 56 record contains no factual allegations that would take State Electric’s conduct outside the type of ordinary contract breach committed by a business counter-party. There is no viable Chapter 93A claim on these facts.
CONCLUSION AND ORDER
            For all the foregoing reasons, the Defendant’s Motion for Summary Judgment shall be ALLOWED IN PART and DENIED IN PART. Summary judgment shall be ALLOWED and enter in favor of the Defendant as to Counts I, II and IV of the Complaint in their entirety. Summary judgment shall be further ALLOWED as to such portion of Count III of the Complaint as alleges a breach of contract pre-dating the parties’ March 23, 2021 agreement, and DENIED as to such portion of Count III of the Complaint as alleges a breach of the parties’ March 23, 2021 agreement insofar as concerns the 321 Harrison Avenue project.
SO ORDERED.